**Robert L. STRAUSS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 19506.

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1963.

Rehearing Denied Feb. 12, 1963.

Thomas B. DeWolf, Helliwell, Melrose & DeWolf, Miami, Fla., for appellant.

Lloyd G. Bates, Jr., Asst. U. S. Atty., Miami, Fla., Rufus D. McLean, Spec. Atty., Herbert J. Miller, Jr., Asst. Atty. Gen., Beatrice Rosenberg, Kirby W. Patterson, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before JONES and BELL, Circuit Judges and ESTES, District Judge.

GRIFFIN B. BELL, Circuit Judge.

This appeal is from a judgment of conviction following a jury verdict of guilty on count eight of an indictment for conspiracy to transfer and conceal assets of a corporation in contemplation of a bankruptcy proceeding by or against the corporation with intent to defeat the bankruptcy laws of the United States.[1]

---

1. 18 U.S.C.A. § 152 in material part provides:

    \*    \*    \*    \*    \*

"Whoever, while an agent or officer of any person or corporation, and in contemplation of a bankruptcy proceeding by or against such person or corporation, or with intent to defeat the bankruptcy law, knowingly and fraudulently transfers or conceals any of the property of such person or corporation; \* \* \*.

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

18 U.S.C.A. § 371 in material part provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect

The co-conspirator named in the indictment, Goodman, plead guilty. In response to a bill of particulars, the government named the wife of appellant, Luella H. Strauss, and Geraldine Bolton, also known as Jeri Bolton, as the unnamed persons with whom appellant was alleged to have conspired.

The first seven counts of the indictment, relating solely to Goodman, were substantive in nature and are not here involved. The District Court in a prior proceeding sustained the motion of appellant to dismiss count 8 of the indictment but this court held that the indictment adequately charged conspiracy to transfer and conceal assets in contemplation of bankruptcy, although it failed to state facts sufficient to charge a violation of the. mail fraud statute. United States v. Strauss, 5 Cir., 1960, 283 F.2d 155. Count 8 of the indictment in pertinent part and overt acts 6 and 11, the ones here involved, are set out in the margin.[2]

Taking the view most favorable to the government to support the verdict, Glasser v. United States, 1942, 315 U.S. 60, 61 S.Ct. 457, 86 L.Ed. 680, the evidence adduced on the trial by the government was that the Harold Corporation was incorporated under the Florida law in January 1956 and in April 1956 acquired a long term lease on the Cadillac Hotel,

Miami Beach, Florida. An addition to the hotel was planned. Appellant and Goodman representing the corporation offered Sam Kay fifteen percent of the amount of the loan, $1,300,000, to obtain a loan within a week with which to build the addition. A loan of $1,250,000 was obtained through Kay from the Miami Beach Federal Savings and Loan Association. Kay, for his services, was assigned a promissory note executed by appellant's wife on August 1, 1956, due ten years after date without interest in the amount of $250,000. Kay also rendered the additional service for appellant and Goodman of preparing the following agreement, Government's Exhibit 9, under date of February 1, 1956. The date is in dispute since Kay testified that he did not meet appellant and Goodman until June 1956. Which date is correct is immaterial under the circumstances of the case but the jury could have believed that the agreement was simply dated February 1, 1956 but executed later. At any rate, it was undisputed that it was executed by appellant, Goodman and Jeri Bolton.

"Miami Beach, Florida, February 1st, 1956.

"This agreement made and entered into this date between Robert L. Strauss and Ray Goodman, hereinafter called the parties of the first

---

the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. COUNT EIGHT

"That from on or about January 1, 1956, continuously to about April 18, 1958, within the Southern District of Florida, Raymond L. Goodman, President of the said Harold Corporation, and Robert L. Strauss, in contemplation of a bankruptcy proceeding by or against the said Harold Corporation, and with intent to defeat the bankruptcy laws of the United States, did wilfully, knowingly, unlawfully and feloniously conspire, combine, confederate, and agree together each with the other and with other persons not herein named as defendants to knowingly and fraudulently transfer and cause to be transferred and conceal and cause to be concealed assets of the said Harold Corporation, * * * "

* * * * *

"(6) From on or about November 8, 1957, to on or about March 27, 1958, in the Southern District of Florida, the said Raymond L. Goodman, drew and cause to be drawn 44 checks on the account of the Harold Corporation in the Miami Beach First National Bank, payable to the order of J. Bolton in amounts totaling $80,-225.69."

* * * * *

"(11) On or about November 15, 1956, in the Southern District of Florida, the said Robert L. Strauss received, endorsed and negotiated a certain check dated November 15, 1956, payable to his order and drawn on the Miami Beach First National Bank, Miami Beach, Florida, in the name of the Harold Corporation, in the amount of $45,000.00. in violation of 18 USC, 371."

part, and Jeri Bolton, hereinafter called the party of the second part.

"Whereas, the parties of the first part have been instrumental in forming a corporation, known as Harold Corporation, a Florida corporation, and

"Whereas, the parties of the first part are the sole holders of stock in the said corporation, and

"Whereas, it is their intention of selling the said stock for the benefit of the owners of the same, and

"Whereas, they are desirous of making many business transactions regarding both monies and stocks in the Harold Corporation, and

"Whereas, they do not desire their names be used in regard to these transactions, and

"Whereas, the party of the second part, in order to convenience the parties of the first part, is willing to allow the parties of the first part to use her name and bank account for the benefit of the parties of the first part.

"Now, therefore, party of the second part agrees to allow either or both of the parties of the first part to deposit monies in her bank account and does further agree that upon either or both of their requests she will issue checks in her name payable to individuals as requested by either or both of the parties of the first part.

"Parties of the first part agree to to accept, buy, sell, and otherwise transfer or hypothecate stock in the Harold Corporation in such a manner as is directed by the parties of the first part.

"The parties of the first part agree to pay to the party of the second part the sum of $500 as compensation for the performance of the covenants contained in paragraphs above by the party of the second part.

"The parties of the first part agree that the party of the second part is in no way connected with the Harold Corporation but is merely accommodating the said parties of the first part and therefore, the parties of the first part agree to save harmless the party of the second part for any transactions arising out of the within agreement.

"In witness whereof, parties have set their hand and seals on the date above written.

"(Signed) RAY GOODMAN,
"Party of the first part.

"ROBERT L. STRAUSS,
"Party of the first part.

"JERI BOLTON,
"Party of the second part."

The Harold Corporation obtained various other funds during 1956 and 1957 through the medium of a loan from the Pan-American Bank of Miami, and through the sale of common and preferred stock and debentures to various investors. An involuntary petition in bankruptcy was filed against the corporation on April 18, 1958 and it was adjudicated bankrupt on June 24, 1958.

The accounting testimony was to the effect that the corporation for the fiscal year ending November 30, 1957, suffered a net loss, after capital charges, in the amount of $485,215.22. Of the total of capital charges, $346,844.88 represented depreciation. It had a capital deficit of $393,596.24 and a total deficit of $748,516.24, the total capital being $355,000.

Appellant offered a balance sheet dated January 31, 1957. It showed the same capital but a surplus of $156,155.29 making total capital of $511,155.29 but this statement did not include depreciation. The fixed assets on this statement were based on appraised value, $3,750,000, but at cost on the November 30 statement, $3,453,864.07 less depreciation in the amount of $435,907.38. Using the November 30 net fixed asset figure, there was a deficit in capital as of January 31, 1957 of $220,888.02. Thus there was a diminishment in the capital figure—really corporate assets as there was no capital

left-over the next nine months of $172,-708.22.

The government relied on the agreement, its Exhibit 9, between appellant, Goodman and Bolton, and on the fact that large sums of money were transferred from the funds of the corporation to the account of Bolton, and to Goodman and appellant. The total amount of the checks introduced in the evidence drawn on the Harold Corporation payable to appellant or from which he allegedly received the proceeds was $122,275. One was in the amount of $45,000. The company constructing the addition to the hotel drew $45,000 from the construction account and transferred it to the Harold Corporation. On the same day the corporation transferred the same amount to appellant by check drawn by Goodman. This check bore the purported endorsement of appellant.

Low, at one time president of the Harold Corporation, testified regarding a series of checks made payable to Jeri Bolton by the corporation which he personally cashed and gave the proceeds either to Goodman or appellant. The proceeds of one check in the amount of $15,000 was given to appellant outside the bank. Low testified that on one occasion he obtained cash on one of the checks made payable to Jeri Bolton and delivered the proceeds to Goodman at the home of the latter where there was an exchange of funds on the front porch with appellant. On another occasion, out of the proceeds of the Pan-American Bank loan to the Harold Corporation, $111,000 was paid to Florida International Corporation, a corporation of which appellant was an officer with the power to write checks. The cashier of the Pan-American Bank testified that checks drawn by appellant on that bank on the account of the Harold Corporation payable either to himself or to cash and purporting to bear his endorsement totaled $54,000. There was evidence that Jeri Bolton drew checks on the account of the Harold Corporation in the Mercantile Bank of Miami in the amount of $16,000 and $7,500 payable to appellant, and these were purportedly endorsed by him. There was another check drawn on the Harold Corporation account in the Miami Beach First National Bank to appellant, purportedly endorsed by appellant and Goodman, in the amount of $25,500. There was also evidence of checks representing funds of the corporation being made payable to Luella H. Strauss, wife of appellant.

Geraldine Zumwalt, formerly Geraldine or Jeri Bolton, identified her signature on the signature card of the Mercantile Bank but testified that she did not know that she had an account there and she knew nothing about the ledger card for her account, and did not recall ever having made a deposit in the bank. She was not positive that the endorsements on the Harold Corporation checks made payable to her were made by her.

The signature of appellant on the agreement with Goodman and Bolton was admitted, and an examiner of questioned documents testified that the signature on it and the check drawn on the Harold Corporation by appellant payable to Florida International for $111,000 and the endorsements on certain of the other checks of the Harold Corporation payable to appellant, purporting to be the signature of appellant, were all made by the same person.

There was no evidence refuting any inference that these funds were transferred improperly to appellant. The basis of the defense was that the burden was on the government to show the impropriety, and that it was just as reasonable to hypothesize propriety as impropriety on the theory that these funds could have been paid to appellant for any number of legitimate reasons such as in satisfaction of loans made, or for salary, or as fees for services rendered. There was no evidence whatever to back up this theory.

■■ Appellant filed a motion just prior to trial asking that the court prescribe the order of proof. This was designed to require the government to prove that appellant was a party to the alleged conspiracy between November 1, 1957 and April 18, 1958 before it proved

acts done pursuant to the conspiracy. The denial of this motion is assigned as error, and the fallacy in the assignment is two-fold. First, the order of proof in a conspiracy case is left to the discretion of the trial court. Putnam v. United States, 1896, 162 U.S. 687, 16 S.Ct. 923, 40 L.Ed. 1118; Thiede v. Utah, 1895, 159 U.S. 510, 16 S.Ct. 62, 40 L.Ed. 237; McDaniel v. United States, 5 Cir., 1928, 24 F.2d 303. Cf. Landers v. United States, 5 Cir., 1962, 304 F.2d 577; United States v. Pugliese, 2 Cir., 1945, 153 F.2d 497. More often than not the clandestine nature of a conspiracy is such that proof, necessarily circumstantial, requires a number of items of evidence before an inference of the conspiracy can be fairly drawn. The grant of such a motion in a run-of-mine conspiracy case such as this would hamstring the prosecution to the extent of making it virtually impossible to prove what in fact was a conspiracy. There is no warrant in law for such a proposition. There was no abuse of discretion in the denial of the motion.

■ Second, the indictment alleges a conspiracy from on or about January 1, 1956 continuously to about April 15, 1958, and appellant cannot narrow the period of the conspiracy, as he attempted to do, by relating this count to substantive counts 6 and 7 against Goodman. The period of the conspiracy was a matter for trial and for proof and the burden was on appellant to show his disassociation from the conspiracy, once he had been connected, as he was, to it. Marbs v. United States, 8 Cir., 1957, 250 F.2d 514, cert. den., 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715; United States v. Markman, 2 Cir., 1952, 193 F.2d 574, cert. den., Livolsi v. United States, 343 U.S. 979, 72 S.Ct. 1079, 96 L.Ed. 1371 and United States v. Cohen, 2 Cir., 1944, 145 F.2d 82, cert. den., 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637. There is no substance to this assignment of error.

The heart of this appeal lies in the contention that the trial court erred in denying motions for acquittal, and to strike evidence which had been admitted subject to proof of the conspiracy, and which if stricken, would have rendered the case for the government insufficient. The trial court, in a carefully and patiently conducted semi-protracted trial held the government strictly to its burden. The agreement between Goodman, appellant and Bolton was relied on by the government as the basic component or central part in the conspiracy. Thereafter, in the main, all of the documentary evidence in any way relevant to the conspiracy, such as documents representing the various financial transactions between the Harold Corporation and the alleged conspirators, was admitted subject to a motion to strike if relevancy was not shown. The government took the position that the conspiracy was being made out by the introduction of the various pieces of evidence and that by the end of its case all of the pieces would fall in place and make out the conspiracy. It was against this background, and when the government rested, that the court denied the motion to strike the evidence, and the motion for acquittal. A motion for acquittal at the close of the case was also denied.

■ This was a circumstantial evidence case from the standpoint of proof of the conspiracy, and as such must be reviewed in the light of the rule that the circumstantial evidence must be not only consistent with the guilt of the accused, but also inconsistent with every reasonable hypotheses of his innocence. Curtis v. United States, 5 Cir., 1961, 297 F.2d 639, and Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. This rule must be applied to a motion for judgment of acquittal and our review of it. But it is not whether in our opinion the evidence fails to exclude every hypotheses other than guilt but rather whether there was evidence from which the jury might reasonably so conclude. We said in Vick v. United States, 5 Cir., 1954, 216 F.2d 228, 232:

"In such cases the test to be applied on motion for judgment of acquittal and on review of the denial of such motion is not simply whether in

the opinion of the trial judge or of the appellate court the evidence fails to exclude every reasonable hypothesis, but that of guilt, but rather whether the jury might reasonably so conclude."

■ We hold that the jury might reasonably so conclude. The agreement between appellant, Goodman and Bolton, the withdrawal of the various funds at a time when the corporation was in shaky financial condition, the lack of any explanation whatever for the withdrawals and the fact that the withdrawals, for aught that appears, went to appellant or to a corporation in which he had an interest, constituted a sufficient fact basis from which an inference of guilty beyond a reasonable doubt could be drawn, while at the same time the jury might reasonably had concluded that the evidence excluded every other reasonable hypothesis save that of guilt.

■ We find no error in the rulings of the trial court concerning identification of the signature of appellant on the specified exhibits. In each instance the exhibit were admitted as records kept in the usual course of business by a bank under 28 U.S.C.A. § 1732, but the objection runs to the claimed want of proof of the signature. It is elementary, putting aside the expert testimony of genuineness of the signatures, that the jury was entitled to draw their own conclusion as to the genuineness of the signature on the various exhibits by a comparison with the admitted signature of appellant on Government Exhibit 9, the agreement between Goodman, appellant and Bolton. 28 U.S.C.A. § 1731; Hickory v. United States, 1894, 151 U.S. 303, 306, 14 S.Ct. 334, 38 L.Ed. 170; French v. United States, 5 Cir., 1956, 232 F.2d 736; Desimone v. United States, 9 Cir., 1955, 227 F.2d 864; Goins v. United States, 4 Cir., 1938, 99 F.2d 147 and In Re Goldberg, 2 Cir., 1937, 91 F.2d 996.

■■ Nor did the court err in reading overt act number six to the jury. The jury was instructed that the indictment was not evidence and that it was not to be considered as evidence of any kind against appellant. This overt act alleged that Goodman drew and caused to be drawn checks on the account of the Harold Corporation in the Miami Beach First National Bank payable to the order of Jeri Bolton in amounts totaling $80,-225.69 between November 8, 1957 and March 27, 1958. The proof in this connection was eleven checks between June 3 and August 29, 1957 payable to the order of Jeri Bolton in amounts totaling $86,879.91. We do not believe that this variance in proof under the circumstances prejudiced appellant. Ledbetter v. United States, 1898, 170 U.S. 606; 18 S.Ct. 774, 42 L.Ed. 1162; Hale v. United States, 5 Cir., 1945, 149 F.2d 401, cert. den., 326 U.S. 732, 66 S.Ct. 40, 90 L.Ed. 436. Substantial similarity between the facts alleged in the overt act and those proved is all that is required. See Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; and United States v. Tramaglino, 2 Cir., 1952, 197 F.2d 928.

■ The last assignment of error rests on the mandatory nature of the Court Reporters Act, 28 U.S.C.A. § 753 (b) (1), which requires that all proceedings in criminal cases had in open court be recorded verbatim. Appellant points out that on fifteen occasions during the trial conferences were held between the court and counsel out of the hearing of the jury and these were not reported. This contention, not called to the attention of the trial court in the motion for new trial, is based on the assertion that the conferences were not informal discussions concerning routine matters of procedure but were, for the most part, arguments concerning the irrelevancy of various testimony and exhibits submitted by the government. It is also alleged that the court reporter did not record the examination of the veniremen. It is the position of appellant that there may or may not have been error in the examination of the veniremen but that it is too late to discover such error as there might have been because there is no transcript of the proceedings. He states

that the error of the trial court "in admitting various pieces of evidence" would be apparent from the statements of the court and counsel made during the fifteen unrecorded conferences, and that a record of these conferences would have revealed the conditions upon which the evidence was admitted and the representations of the government as to how the evidence would be subsequently connected up. Appellant, because the conferences were not recorded, states that he is unable to present argument as to any error of the trial court which would otherwise be apparent, and that a supplemental record cannot cure this defect since an attempt to reconstruct such a large number of complicated arguments would be futile.

Without passing on the question of whether a conference between the court and counsel in the courtroom, but without the hearing of the jury, is in open court, as open court is used in the statute, we find no merit in this assignment of error. No effort has been made to reconstruct the substance of these conferences for submission on supplemental record. Furthermore, no specific error or prejudice resulting therefrom is called to our attention. This is the very least that would be required under Stephens v. United States, 5 Cir., 1961, 289 F.2d 308, where errors were specified, and where there was no record on which to test the claimed errors. To permit an appellant simply to claim error for failure to record under the Act, without more, would eliminate the necessity of a showing of prejudice because of the error. The error may well have been harmless when considered in the light of the facts which were reported. The footnote in our case of Stansbury v. United States, 5 Cir., 1955, 219 F.2d 165 to the effect that conferences outside the hearing of the jury may not be proper unless reported is relied on by appellant. This indefinite statement was wholly unnecessary to the decision reached. The substance of what transpired in the unreported conference was before the court on a reconstructed supplemental record. While we may well agree wtih the state-ment that the better practice would be for trial judges to call the reporter to the bench to record conferences between court and counsel, the determination of whether failure to do so constitutes error must await a case giving rise to the question. We have never held that a failure to comply with the Court Reporter Act is error per se. See Fowler v. United States, 5 Cir., 1962, 310 F.2d 66; and United States v. Taylor, 4 Cir., 1962, 303 F.2d 165. We do not do so now and that in substance is the question before us.

Appellant was duly and fairly tried. The verdict rested on a sufficient evidentiary foundation. No prejudicial error has been shown. The judgment of conviction should be and is

Affirmed.